[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10697

_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

*versus*

KARL PATRICK KLUGE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

D.C. Docket No. 2:22-cr-00023-SPC-NPM-1

_____

Before BRANCH, LUCK, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

Karl Patrick Kluge appeals his sentence for possession of child pornography. Kluge challenges several aspects of the amended judgment below, including the district court's calculation of his offense level, the restitution order, and the way Kluge's sentence was pronounced. After careful review and with the benefit of oral argument, we affirm both Kluge's sentence and the order of restitution.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In May 2021, the Federal Bureau of Investigation ("FBI") discovered that a computer belonging to Karl Patrick Kluge was sharing files containing child pornography via a peer-to-peer network. After obtaining a search warrant, the FBI searched Kluge's residence and seized several digital devices belonging to Kluge, including a thumb drive, a laptop computer, and three cellphones. A forensic examination of those devices revealed that Kluge had used file-sharing software to download and share over 300 images and 150 videos depicting minors engaged in sexually explicit conduct.

On March 9, 2022, a grand jury in the Middle District of Florida indicted Kluge on one count of possessing, and accessing with intent to view, child pornography involving a minor under twelve years of age, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2). Kluge waived his right to a jury trial and proceeded to a

bench trial based on stipulated facts. Following the bench trial, the district court found Kluge guilty on the charged offense.

Prior to sentencing, the United States Probation Office prepared a Presentence Investigation Report for Kluge, which calculated Kluge's total offense level to be 30. This calculation included a five-level enhancement under U.S.S.G. § 2G2.2(b)(7)(D) for offenses involving 600 or more images of child pornography. Based on the Sentencing Commission's commentary in Application Note 6(B)(ii) to this section, each video was counted as 75 images, placing Kluge well into the highest enhancement category.

Kluge objected to the district court's calculation of this enhancement at his sentencing hearing, arguing that "the text of the guideline does not suggest a distinction between a still image or a video image." The district court overruled that objection, finding that the Guideline was ambiguous as to the number of images in a video and that reliance on the commentary was appropriate. Accordingly, the court calculated Kluge's total offense level as 30, resulting in an advisory guideline range of 97 to 121 months' imprisonment.

The district court sentenced Kluge to 97 months' imprisonment, to be followed by 15 years of supervised release. In pronouncing Kluge's sentence, the court explained that, while on supervised release, Kluge would "need to comply with the mandatory and standard conditions adopted here in the Middle District of Florida," but did not orally enumerate each standard condition. The written judgment, however, listed each of these conditions.

After sentencing, thirteen individuals submitted claims seeking restitution under the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-229, 132 Stat. 4383 (codified at 18 U.S.C. § 2259).  That law requires a defendant convicted of trafficking in child pornography to pay each victim mandatory restitution "in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is no less than $3,000."  18 U.S.C. § 2259(b)(2)(B).  Kluge moved to empanel a jury to determine the amount of restitution, asserting that imposing restitution based on judicial fact-finding would violate his Fifth and Sixth Amendment rights.  The district court denied Kluge's motion, concluding that a criminal defendant's constitutional right to a jury trial does not extend to factual findings underlying restitution awards.  The district court ultimately ordered Kluge to pay $3,000 in restitution to each of the thirteen victims—the mandatory minimum—totaling $39,000. The district court then issued an amended judgment, reflecting both the original sentence and the restitution order, which Kluge timely appealed.

## II.    STANDARDS OF REVIEW

"We review *de novo* the interpretation and application of the Sentencing Guidelines."  *United States v. Dupree*, 57 F.4th 1269, 1272 (11th Cir. 2023) (en banc).  Likewise, we review *de novo* the legality of a restitution order.  *United States v. Dickerson*, 370 F.3d 1330, 1335 (11th Cir. 2004).

In general, we review the imposition of discretionary conditions of supervised release for abuse of discretion, *United States v. Etienne*, 102 F.4th 1139, 1144 (11th Cir. 2024), but when a defendant fails to raise his objection in the district court, we review for plain error, *United States v. Carpenter*, 803 F.3d 1224, 1237 (11th Cir. 2015). We decide *de novo* whether the defendant had an "opportunity to object at sentencing because the court included the [condition] for the first time in its written final judgment." *United States v. Rodriguez*, 75 F.4th 1231, 1246 n.5 (11th Cir. 2023) (quoting *United States v. Bull*, 214 F.3d 1275, 1278 (11th Cir. 2000)).

### III.    ANALYSIS

On appeal, Kluge raises four issues. First, Kluge argues that the district court miscalculated his offense level—specifically, the sentencing enhancement under U.S.S.G. § 2G2.2(b)(7)(D)—by erroneously deferring to the Sentencing Commission's commentary that a video "shall be considered to have 75 images." U.S.S.G. § 2G2.2(b)(7) cmt. n.6(B)(ii). Next, Kluge challenges the propriety of the restitution order, both because the district court refused to submit all underlying factual determinations to a jury, and because the district court did not disaggregate any losses caused by the initial abuse of each victim in calculating the restitution award. Finally, Kluge maintains that he was deprived of an opportunity to object to his sentence's conditions of supervised release because the district court did not orally pronounce each "standard condition" of supervised release during the sentencing hearing. We address these issues in turn.

### A.    Calculating the Sentencing Enhancement under U.S.S.G. § 2G2.2(b)(7)

We begin with Kluge's argument that the district court miscalculated his offense level by erroneously applying U.S.S.G. § 2G2.2(b)(7)'s five-point sentencing enhancement for an offense involving 600 or more "images" of child pornography. Under that section, a defendant's offense level increases with the number of "images" involved in the offense based on the following schedule:

(7) If the offense involved--
   (A)    at least 10 images, but fewer than 150, increase by 2 levels;
   (B)    at least 150 images, but fewer than 300, increase by 3 levels;
   (C)    at least 300 images, but fewer than 600, increase by 4 levels; and
   (D)    600 or more images, increase by 5 levels.

U.S.S.G. § 2G2.2(b)(7).[1]

Although the text of the Guidelines does not define "images," the Sentencing Commission's commentary defines the term as "any visual depiction . . . that constitutes child pornography." *Id.* § 2G2.2(b)(7) cmt. n.6(A). The commentary also explains that, for "purposes of determining the number of images" involved in the offense, each "photograph" shall be counted as one "image," and each "video, video-clip, movie or similar visual depiction shall be considered to have 75 images." *Id.* § 2G2.2(b)(7) cmt. n.6(B). The

---

[1] We sometimes refer to this section as the "image table" in this opinion.

commentary also recommends an upward departure if "the number of images substantially underrepresents the number of minors depicted" or "the length of the visual depiction is substantially more than 5 minutes." *Id.*

At sentencing, the district court applied the commentary's 75:1 images-to-video calculation to conclude that Kluge, who was caught with over 300 pictures and 150 videos, possessed more than 600 "images" of child pornography, and assigned him the five-point maximum enhancement. Kluge says that this was an error. Kluge contends that the district court should not have deferred to the commentary's interpretation that a video contains 75 images. Instead, Kluge argues that because "images" unambiguously means "pictures of child pornography," without any distinction between still and moving pictures, the district court should have counted each video as one image.

Like an "agency's interpretation of its own legislative rules," in some circumstances the Sentencing Commission's commentary may be entitled to deference. *See Dupree*, 57 F.4th at 1276 (quoting *Stinson v. United States*, 508 U.S. 36, 45 (1993)). In considering whether that is the case, we apply the three-step framework the Supreme Court articulated in *Kisor v. Wilkie*, 588 U.S. 558 (2019). *See Dupree*, 57 F.4th at 1274–77.

At Step 1, we "must exhaust all the 'traditional tools' of construction," considering "the text, structure, history, and purpose of a regulation" to determine whether the regulation is genuinely ambiguous. *Kisor*, 588 U.S. at 573–75 (quotation omitted). "'If

uncertainty does not exist' after applying these tools, 'there is no plausible reason for deference,'" and we simply apply the unambiguous meaning of the Guideline. *Dupree*, 57 F.4th at 1275 (quoting *Kisor*, 588 U.S. at 574–75).

But if "genuine ambiguity remains," we proceed to Step 2, which asks whether the commentary's interpretation of the text is "reasonable." *Kisor*, 588 U.S. at 575 (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994)). To be reasonable, that interpretation must "come within the zone of ambiguity the court has identified after employing all its interpretive tools," such that it falls within "the outer bounds of permissible interpretation" established by the rule's text, structure, and history. *Id.* at 576.

Finally, if the commentary's interpretation is reasonable, at Step 3, we "must make an independent inquiry into whether the character and context" of the agency's reasonable interpretation "entitles it to controlling weight." *Id.* Deference would not be appropriate if the interpretation is not the "official position" of the agency, does not implicate the agency's "substantive expertise," or fails to "reflect fair and considered judgment." *Id.* at 576–79 (internal quotations omitted). Only if these conditions are met do we defer to the commentary's interpretation. *See Dupree*, 57 F.4th at 1274–75.

Here, we need not go beyond Step 1, as § 2G2.2(b)(7) leaves no ambiguity regarding the number of "images" contained in a video. We start, "[a]s always with statutory interpretation, . . . with the text." *Rodriguez v. Branch Banking & Tr. Co.*, 46 F.4th 1247, 1254

(11th Cir. 2022). Because the Guidelines do not define "images," we "look to the common usage" of the word to determine its ordinary meaning. *United States v. Hall*, 64 F.4th 1200, 1205 (11th Cir. 2023). In doing so, we "may turn to 'dictionary definitions for guidance.'" *Id.* (quoting *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222–23 (11th Cir. 2001)).

Contemporaneous with § 2G2.2(b)(7)'s promulgation in 2003, the Eleventh Edition of *Merriam-Webster's Collegiate Dictionary* defines "image" as "a visual representation of something" such as "a likeness of an object produced on a photographic material" or "a picture produced on an electronic display." *Image*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003); *see also* A. Scalia & B.A. Garner, *Reading Law: The Interpretation of Legal Texts* 78 (2012) ("Words must be given the meaning they had when the text was adopted."). Other dictionaries from around that time provide a similar understanding. *See, e.g.*, *Image*, American Heritage Dictionary (4th ed. 2000) ("A reproduction of the form of a person or object."); *Image*, Shorter Oxford English Dictionary (6th ed. 2007) ("A representation of the external form of a person or thing in sculpture, painting, etc."); *Image*, Oxford English Dictionary (3d ed. 2009) ("A physical or digital representation of something, originally captured using a camera from visible light, and typically reproduced on paper, displayed on a screen, or stored as a computer file"; "any picture or graphic . . . in printed form[.]").

Based on these definitions, we reject Kluge's assertion that "the plain meaning of 'images' does not distinguish between a still

photo and a video."  Instead, "[o]rdinary usage makes plain that an 'image' is a fixed visual representation." *United States v. Haggerty*, 107 F.4th 175, 184 (3d Cir. 2024).  As Judge Larsen explained in her thorough textual analysis of § 2G2.2(b)(7), "[o]ne can hardly reproduce a moving thing 'on paper' or 'in printed form.'" *United States v. Phillips*, 54 F.4th 374, 391 (6th Cir. 2022) (Larsen, J., concurring in the judgment) (quoting *Image*, Oxford English Dictionary (3d ed. 2009)). And as the Third Circuit also observed, "[i]f 'image' needs the modifier 'moving' to accurately describe what is depicted or displayed, then [it] can hardly be equated with the term 'video.'" *Haggerty*, 107 F.4th at 183.

Rather, "a video inherently contains multiple 'images,'" *id.* at 184, since a video is nothing more than a "sequence of images processed electronically into an analog or digital format and displayed on a screen with sufficient rapidity as to create the illusion of motion and continuity," *Phillips*, 54 F.4th at 392 (Larsen, J., concurring in the judgment) (quoting *Video*, American Heritage Dictionary (5th ed. 2018)); *see also Video*, Merriam Webster's Collegiate Dictionary (11th ed. 2003) ("a recording of a motion picture or television program for playing through a television set[;] . . . relating to, or involving images on a television screen or computer display"); *Videotape*, Merriam Webster's Collegiate Dictionary (11th ed 2003) ("a recording of visual images and sound"); *Video*, Oxford English Dictionary (3d ed. 2009) ("relating to, or concerned with the images displayed on a television or other electronic device, or the electrical signal, channel, etc., conveying such images").  And in the context of video, each individual image in that sequence is

23-10697                Opinion of the Court                11

called a "frame." *See, e.g.*, *Frame*, Merriam Webster's Collegiate Dictionary (11th ed. 2003) ("[O]ne picture in the series on a length of film."); *Frame*, American Heritage Dictionary (5th ed. 2018) ("One of the set of still images that constitute a film or video."). Thus, the plain meaning of § 2G2.2(b)(7) unambiguously instructs that each video frame that contains child pornography counts as one "image" for purposes of calculating any sentencing enhancement.

In opposition to Kluge's argument and in support of the district court's calculation of Kluge's sentence, the Government argues that "images" as used in § 2G2.2(b)(7) is ambiguous and that the commentary's interpretation that each video containing child pornography counts as seventy-five "images" is therefore entitled to deference. In an effort to find ambiguity in the Guideline's text, the Government appeals to § 2G2.2(b)(7)'s purpose and history. To the extent those considerations are relevant,[2] they do not change our conclusion that "images" as used in § 2G2.2(b)(7) is plain and unambiguous.

---

[2] *Kisor* requires a court to "exhaust all the 'traditional tools' of construction" "before concluding that a rule is genuinely ambiguous." *Kisor*, 588 U.S. at 575 (quotation omitted). Because judicial construction of an agency rule or regulation does not differ methodologically from statutory construction, *id.,* when the "text is clear, we needn't consult extra-textual evidence concerning 'history' and 'purpose.'" *Callahan v. U.S. Dep't of Health & Hum. Servs. ex rel. Azar*, 939 F.3d 1251, 1262 (11th Cir. 2019). Regardless, out of an abundance of caution, we consider—and reject—the Government's arguments that the history and purpose of § 2G2.2(b)(7) render the term "images" ambiguous.

Our understanding of § 2G2.2(b)(7)'s purpose "must be derived from the text." Scalia & Garner, *supra*, at 56. According to the Government, "Congress added the image table to increase punishments based on 'the amount of child pornography involved in the offense.'" And the structure of the image table appears to reflect that purpose, as the enhancement increases in proportion to the number of images involved in the offense.

The Government maintains, however, that a one-frame-one-image rule would "obviat[e] the purpose of prescribing different levels," because "the possession of almost any video would 'vault the offender to the top of the range.'" But, as the Government concedes, "a video contains multiple images," and thus a greater amount of child pornography than a still photograph, *see United States v. Lynde*, 926 F.3d 275, 280 (6th Cir. 2019) ("[V]ideos and movies cause more harm and so should be weighed much more heavily than photos or pictures."). Counting each video frame as an image is therefore consistent with the purpose identified by the Government: linking punishment to the amount of child pornography possessed. To the extent that the Government believes that "quantifying pornographic matter contained in a video or motion picture on the basis of the number of frames contained within it may yield sentences that seem unusually harsh, we cannot engage in an exercise of semantic selection with an over-riding concern for results." *Haggerty*, 107 F.4th at 189.

Moreover, the history surrounding § 2G2.2(b)(7) only confirms the Guideline's plain text. Congress enacted the image table

23-10697              Opinion of the Court              13

to rectify the prior Guideline's failure to account for the volume of the material at sentencing. *See Haggerty*, 107 F.4th at 181 ("'The Act amended the Sentencing Guidelines to increase penalties based on the amount of child pornography involved in the offense." (quotation omitted)). Because the Guideline did not define "an 'image' for purposes of applying these new 'image tables,'" the Sentencing Commission sought public comment on how videos should be counted. 68 Fed. Reg. 75,340, 75,353 (Dec. 30, 2003). In a letter to the Sentencing Commission, the Department of Justice expressly recognized that "[e]ach frame is equivalent to one still image." *See* Letter from Deborah J. Rhodes, Counselor to the Assistant Att'y Gen., U.S. Dep't of Just., to the U.S. Sentencing Comm'n, at 5 (Mar. 1, 2004), *available at* https://perma.cc/NCF7-ADKH. It is of no matter that neither the Sentencing Commission nor the Department of Justice ultimately endorsed this view, since the interpretation the agency adopts becomes relevant "only 'if the meaning of the words used is in doubt.'" *Kisor*, 588 U.S. at 574 (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). And here, there is no doubt that "image" means "frame" in the context of a video.

Unable to avoid § 2G2.2(b)(7)'s plain meaning, the Government argues that counting each frame containing child pornography as one image would result in absurdity. Specifically, the Government takes issue with the fact that the one-frame-one-image rule would treat differently a "defendant [who] possessed a video taken by a super-slow-motion camera capturing 1000 frames per

second" and another who "possessed the same video shot by a regular camera."

To begin, the fact that a result seems harsh does not render it absurd. *See, e.g., St. Louis, Iron Mountain & S. Ry. Co. v. Taylor*, 210 U.S. 281, 295 (1908). Moreover, in the scenario posited by the Government, any disparity in sentencing would simply be a function of the relative amount of child pornography each defendant possessed. If either defendant "paused one of his videos and printed a frame," each printout would count as one image. *Phillips*, 54 F.4th at 391 (Larsen, J., concurring in the judgment). So, the defendant who possessed more frames "necessarily . . . possess[ed] more pornographic material." *Haggerty*, 107 F.4th at 189. It is hardly absurd that we would decline to "rewrite the statute that Congress has enacted" simply because one child pornographer is caught with many more similar—though not identical—images. *See Dodd v. United States*, 545 U.S. 353, 359 (2005).

★      ★      ★

We conclude that § 2G2.2(b)(7) unambiguously dictates that each video frame containing child pornography counts as one image. To calculate this sentencing enhancement, the government must present evidence for the district court to determine the number of frames containing child pornography. As the Third Circuit has recognized, this task could likely be accomplished by first identifying "how many seconds within [the] video contain child pornography" and then multiplying that number by the video's frame rate. *Haggerty*, 107 F.4th at 188. However, such review is not

necessary here.  At oral argument, Kluge conceded that, under the one-frame-one-image rule, his 300 pictures and 150 videos would contain more than 600 images of child pornography.  Because Kluge remains in the highest category of the image table, his sentencing enhancement under § 2G2.2(b)(7) does not change based on the rule we announce today and we thus affirm the district court's calculation of Kluge's total offense level.

### B.    The Restitution Order

Next, we consider the propriety of the district court's restitution order.  For defendants convicted of trafficking child pornography, a district court must "order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is no less than $3,000."  18 U.S.C. § 2259(b)(2)(B).  After Kluge's conviction, "13 of Kluge's victims . . . had requested restitution and had submitted documentation supporting their requests."  The district court concluded at Kluge's restitution hearing that it was "appropriate to grant restitution in this case" and awarded each victim the mandatory minimum of $3,000, totaling $39,000.

Kluge challenges that order on two grounds.  First, Kluge argues that the district court's refusal to submit the underlying factual determinations as to the amount of restitution to a jury violated his Fifth and Sixth Amendment rights.  Second, Kluge maintains that the district court was required to disaggregate the value of the victim's losses caused by the initial abuse from the amount

of restitution Kluge was ordered to pay. As explained below, both arguments fail under our binding precedent.

> 1.    *The Constitutionality of Judicial Factfinding for Restitution*

We begin with Kluge's constitutional challenge to the restitution order. Kluge contends that a jury—rather than the judge—was required to "determine beyond a reasonable doubt . . . the essential findings required to trigger the $3,000 mandatory minimum restitution award[s]," including the identity of the victims, their total losses, and the portion of those losses attributable to Kluge's actions.

Kluge bases this argument on the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 570 U.S. 99 (2013). In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. *Alleyne* extended that rule by requiring that all "facts that increase mandatory minimum sentences . . . be submitted to the jury" as well. *Alleyne*, 570 U.S. at 117. In Kluge's view, "because a court can't award any restitution without finding additional facts about the victim's losses," *Apprendi* and *Alleyne* dictate that those findings should have been made by a jury. This argument, however, relies on the assumption that *Apprendi* and its progeny apply to restitution at all. Our precedents vitiate that assumption.

In *United States v. Gatlin*, we considered whether *Apprendi* applied in the context of mandatory restitution under 18 U.S.C. § 3663A. *See* 90 F.4th 1050, 1074 (11th Cir. 2024). Concluding that it did not, we explained that "we explicitly rejected this argument in *Dohrmann v. United States*, 442 F.3d 1279, 1281 (11th Cir. 2006), where we held that *Apprendi* does not apply to restitution orders because the restitution statute, 18 U.S.C. § 3663, does not have a prescribed statutory maximum." *Gatlin*, 90 F.4th at 1074. Just like § 3663 and § 3663A, § 2259 prescribes no statutory maximum for restitution. And without a statutory maximum, there can be no *Apprendi* issue. *See Dohrmann*, 442 F.3d at 1281.

Kluge's *Alleyne* argument fares no better. In his view, *Alleyne* applies because a finding of fact—specially, the identification of a victim—is "required to trigger the $3,000 mandatory minimum restitution award" under § 2259. But *Alleyne*'s protections "only come into consideration if we first conclude restitution is a criminal penalty." *Gatlin*, 90 F.4th at 1074 (quoting *United States v. Wolfe*, 701 F.3d 1206, 1217 (7th Cir. 2012)). In *Gatlin*, we explicitly "decline[d] to reach such a conclusion." *Id.* (quoting *Wolfe*, 701 F.3d at 1217). Moreover, in broadly holding "that *Apprendi* does not apply to a restitution order," *Dohrmann* adopted the view of our sister circuits that "restitution is a civil penalty, not a criminal one." *Dohrmann*, 442 F.3d at 1281 (quoting *United States v. Behrman*, 235 F.3d 1049, 1054 (7th Cir. 2000)); *see United States v. Carruth*, 418 F.3d 900, 904 (8th Cir. 2005) ("[R]estitution orders . . . are not in the nature of a criminal penalty."). That is also the case in the context of *Alleyne*. *See United States v. Payne*, 763 F.3d 1301, 1304 (11th Cir.

2014) ("The same reasoning applies to *Alleyne* . . . because *Alleyne* is an extension of *Apprendi*.").

Resisting this conclusion, Kluge relies on our statement in *United States v. Johnson*, 983 F.2d 216, 220 (11th Cir. 1993) that restitution "is penal, rather than compensatory." But neither *Johnson*—nor any of the other cases Kluge cites, *see United States v. Twitty*, 107 F.3d 1482, 1493 n.12 (11th Cir. 1997); *United States v. Hairston*, 888 F.2d 1349, 1355 (11th Cir. 1989); *United States v. Satterfield*, 743 F.2d 827, 836 (11th Cir. 1984)—consider whether restitution is the type of punishment that falls within "the historical role of the jury at common law," *S. Union Co. v. United States*, 567 U.S. 347, 353 (2012) (quotation omitted), and thus, whether it is the type of penalty that triggers the Sixth Amendment right to a jury trial under *Apprendi*. Thus, these cases do not conflict with our later holdings that place restitution outside of *Apprendi*'s scope.

In a supplemental filing, Kluge cites to this Court's decision in *United States v. Sotelo*, 130 F.4th 1229 (11th Cir. 2025), and contends that the Court's language that "[n]either the text of § 2259 nor any Supreme Court or Eleventh Circuit cases specifically address whether [§ 2259(b)(2)(B)'s] mandatory $3,000 is subject to *Apprendi*[,]" *id.* at 1250, means that *Dohrmann* and its progeny do not control here. Kluge misapprehends the language in *Sotelo*. First, as we explained in *Sotelo*, we did not reach the merits of the *Apprendi* restitution question because we were reviewing for plain error. *Id.* Because we were reviewing for plain error, we considered whether there was explicit statutory language or "precedent from the

23-10697                    Opinion of the Court                    19

Supreme Court or this Court directly resolving" the issue. *Id.* As "[n]either the text of § 2259 nor any Supreme Court or Eleventh Circuit cases specifically address whether [§ 2259(b)(2)(B)'s] mandatory $3,000 is subject to *Apprendi*[,]" *id.* at 1250, we held that the district court did not plainly err in not applying *Apprendi*'s beyond-a-reasonable-doubt standard in determining restitution. Sotelo's plain error analysis is thus not applicable here as we are addressing the merits. And as discussed above, our prior precedents have broadly "decline[d]" to extend *Apprendi*'s logic to the context of restitution—mandatory or otherwise. *Gatlin*, 90 F.4th at 1074 (citing *Dohrmann*, 442 F.3d at 1281). Under our prior precedent rule, we remain bound by our holding that "*Apprendi* does not apply to restitution orders," *id.* (citing *Dohrmann*, 442 F.3d at 1281), and extend that holding to restitution orders pursuant to § 2259(b)(2)(B). We thus conclude that Kluge's constitutional challenge to the restitution order lacks merit.[3]

---

[3] While this appeal was pending, the Supreme Court granted certiorari in *United States v. Ellingburg*, 113 F.4th 839 (8th Cir. 2024), *cert. granted sub nom. Ellingburg v. United States*, 145 S. Ct. 1899 (2025) (mem.), to address a circuit split on whether restitution under the Mandatory Victim Restitution Act is a criminal punishment for purposes of the Ex Post Facto Clause. In *Ellingburg*, the Eighth Circuit noted that the Eleventh Circuit recognizes restitution under the MVRA as "a criminal penalty." 113 F.4th at 842 (citing *United States v. Siegel*, 153 F.3d 1256, 1260 (11th Cir. 1998)). To be sure, we held in *Siegel* that MVRA restitution "cannot be applied to a person" retroactively without violating the Ex Post Facto Clause because "restitution is a criminal penalty carrying with it characteristics of criminal punishment." *Siegel*, 153 F.3d at 1260. But *Siegel* "cannot make law beyond the facts of the cases in which those decisions are announced." *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 762 (11th

### 2.    *Disaggregation*

We next address Kluge's argument that the district court erred in setting restitution by failing to "disaggregate" the value of the victim's loss caused by the initial abuse from the award.  But, as Kluge acknowledges, our opinion in *United States v. Rothenberg*, 923 F.3d 1309 (11th Cir. 2019), forecloses this argument.

In *Rothenberg*, we made clear that "a district court is not required to determine, calculate, or disaggregate the specific amount of loss caused by the original abuser-creator or distributor of child pornography before it can decide the amount of the victim's losses caused by the later defendant who possesses and views the images." *Id*. at 1333.  Instead, a court "need only indicate in some manner that it has considered that the instant defendant is a possessor, and not the initial abuser or a distributor, and has assigned restitution based solely on the defendant possessor's particular conduct and relative role in causing those losses."  *Id*. at 1334 (citing *Paroline v. United States*, 572 U.S. 434, 458–62 (2014)).  Here, the district court did just that by acknowledging that while "Kluge was not the individual who abused these children[,] . . . he was in possession of child pornographic material," and thus contributed to "the issues

---

Cir. 2010).  And while *Siegel* makes no holding as to the constitutionality of judicial fact finding for restitution, *Gatlin* and *Dohrmann* surely do. Under the prior panel precedent rule, "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or this court sitting en banc." *United States v Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008).

that these children now have to deal with." We thus conclude that Kluge's disaggregation argument fails.

### C.    Notice of the Conditions of Supervised Release

Lastly, Kluge argues that the district court erred by including thirteen discretionary conditions of supervised release in the written judgment, despite neither identifying those conditions on the record at sentencing nor enumerated in the presentence investigation report. Kluge contends that we must review this issue *de novo* because he did not have the opportunity to object to the discretionary conditions before they were included in the written judgment. However, as Kluge conceded at oral argument, this argument is plainly foreclosed by our precedent in *United States v. Hayden*, 119 F.4th 832 (11th Cir. 2024).

In *Hayden*, we explained that a defendant is given notice of, and opportunity to be heard on, the conditions of his supervised released as long as "the district court informed him that there were standard conditions attached to his supervised release" and "asked for objections before ending the hearing." *Id.* at 838. Here, the district court afforded Kluge due process to object to the conditions of his supervised release, as it informed Kluge on the record that he would "need to comply with the mandatory and standard conditions [of supervised release] adopted here in the Middle District of Florida," and gave him an opportunity to object to the sentence and how it was pronounced. Since Kluge raised no objections to the conditions of supervised release at his hearing, *Hayden* instructs that "we review his challenge for plain error." *Id.* And, just as in

*Hayden*, "[b]ecause the district court orally referenced the [thirteen] discretionary standard conditions of supervised release for the Middle District of Florida and because the oral pronouncement and written judgment do not conflict, we conclude that the district court did not err—much less plainly err—when it failed to describe the conditions of supervised release in its oral pronouncement." *Id.* at 838–89.

## IV.    CONCLUSION

For all these reasons, we affirm Kluge's sentence and the order of restitution.

**AFFIRMED**.